# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

1-800-411-Pain Referral Service, LLC,           Civil No. 12-3034 (SRN/TNL)
Truman Injury PLLC, and Sergio Triana,

          Plaintiffs,

      v.                            **MEMORANDUM OPINION**
                                        **AND ORDER**

Richard Tollefson, D.C., Ralph Stouffer,
Matthew Anderson, D.C., Howard
Fidler, D.C., Robert Daschner, D.C., Kay
Strobel, Teresa Marshall, D.C.,
Minnesota Board of Chiropractic
Examiners, in their official capacities,

          Defendants.

---

Eric C. Tostrud and David W. Asp, Lockridge, Grindal, Nauen, PLLP, 100 Washington
Avenue South, Suite 2200, Minneapolis, Minnesota 55401, for Plaintiffs.

Kermit N. Fruechte, Minnesota Attorney General's Office, Suite 1400, 445 Minnesota
Street, St. Paul, Minnesota 55101, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

      This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction

[Doc. No. 6]. The Court heard oral argument on December 17, 2012. For the reasons

stated below, Plaintiffs' Motion is denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

      On December 4, 2012, Plaintiffs filed this action for a declaratory judgment that

certain pending amendments to Minnesota's No-Fault Automobile Insurance Act (the

"No-Fault Act"), Minn. Stat. § 65B.54, subd. 6(d)(1)-(3), (5), and (6), violate the First

Amendment to the Constitution of the United States.  (Complaint ¶¶ 38-59 [Doc. No. 1].)
Through the instant motion, Plaintiffs seek to enjoin Defendants from enforcing the
statute, which will otherwise go into effect on January 1, 2013.

Plaintiff 1-800-411-Pain Referral Service, LLC ("411 Pain") is a legal and medical
referral service, incorporated in the State of Florida.  (Id. ¶ 11.)   411 Pain maintains a
referral network with chiropractors and medical doctors, to whom accident victims are
referred after calling 1-800-411-PAIN.  (Id. ¶¶ 15, 17.)  Advertising "assistance for
accident victims through billboards, radio, television, print, and internet advertisements,"
411 Pain promotes itself in several states, including Minnesota.  (Id. ¶ 16.)   411 Pain
contends that its extensive advertising provides a benefit to the providers in its network,
who might otherwise be unable to undertake such advertising campaigns on their own.
(Id. ¶ 17.)  Plaintiffs Truman Injury PLLC ("Truman Injury") and Sergio Triana, D.C. are
part of 411-Pain's chiropractic network in Minnesota.  (Id. ¶ 22.)  Defendants are
members of the Minnesota Board of Chiropractic Examiners.  (Id. ¶ 14.)  Plaintiffs allege
that Defendants, in their official capacities, have the authority to take disciplinary action
for violations of Minn. Stat. § 65B.54, subd. 6(e).  (Id. ¶ 14.)

Minnesota's No-Fault Act, enacted in 1974, requires that insurers provide certain
benefits to insureds who are injured in car accidents.  Minn. Stat. § 65B, §§ 41-71.  Under
the No-Fault Act, insurers are required to pay basic economic loss benefits regardless of
the fault of the insured, including up to $20,000 for medical expense loss, and up to
$20,000 for income loss, replacement service loss, funeral loss, survivor's economic loss,
and survivor's replacement services loss.  Minn. Stat. § 65B.44, subd. 1(a)(1)-(2) (2007).

2

The No-Fault Act also contains a subdivision addressing the unethical practices of health care providers, prohibiting them from initiating direct contact with injured automobile accident victims.  Minn. Stat. § 65B.54, subd. 6. (2009). The constitutionality of some of the 2012 amendments to Subdivision 6(d) forms the basis of the instant motion for emergency injunctive relief.  Subdivision 6, with the amendments either underscored or stricken below, provides as follows:

> Subd. 6. **Unethical practices.** (a) A licensed health care provider shall not initiate direct contact, in person, over the telephone, or by other electronic means, with any person who has suffered an injury arising out of the maintenance or use of an automobile, for the purpose of influencing that person to receive treatment or to purchase any good or item from the licensee or anyone associated with the licensee. This subdivision prohibits such direct contact whether initiated by the licensee individually or on behalf of the licensee by any employee, independent contractor, agent, or third party, including a capper, runner, or steerer, as defined in section 609.612, subdivision 1, paragraph (c). This subdivision does not apply when an injured person voluntarily initiates contact with a licensee.
> (b) This subdivision does not prohibit licensees, or persons acting on their behalf, from mailing advertising literature directly to such persons, so long as:
> (1) the word "ADVERTISEMENT" appears clearly and conspicuously at the beginning of the written materials;
> (2) the name of the individual licensee appears clearly and conspicuously within the written materials;
> (3) the licensee is clearly identified as a licensed health care provider within the written materials; and
> (4) the licensee does not initiate, individually or through any employee, independent contractor, agent, or third party, direct contact with the person after the written materials are sent.
> (c) This subdivision does not apply to:
> (1) advertising that does not involve direct contact with specific prospective patients, in public media such as telephone directories, professional directories, ads in newspapers and other periodicals, radio or television ads, Web sites, billboards, mailed or electronically transmitted communication, or similar media if such advertisements comply with paragraph (d);
> (2) general marketing practices, other than those described in clause (1), such as giving lectures; participating in special events, trade shows, or

meetings of organizations; or making presentations relative to the benefits of ~~chiropractic~~ a specific medical treatment;

(3) contact with friends or relatives, or statements made in a social setting;

(4) direct contact initiated by an ambulance service licensed under chapter 144E, a medical response unit registered under section 144E.275, or by the emergency department of a hospital licensed under chapter 144, for the purpose of rendering emergency care; or

(5) a situation in which the injured person:

(i) had a prior professional relationship with the licensee;

(ii) has selected that licensee as the licensee from whom the injured person receives health care; or

(iii) has received treatment related to the accident from the licensee.

(d) For purposes of this paragraph, "legal name," for an individual means the name under which an individual is licensed or registered as a health care professional in Minnesota or an adjacent state, and for a business entity, a name under which the entity is registered with the secretary of state in Minnesota or an adjacent state, so long as the name does not include any misleading description of the nature of its health care practice; and "health care provider" means an individual or business entity that provides medical treatment of an injury eligible as a medical expense claim under this chapter. In addition to any laws governing, or rules adopted by, a health care provider licensing board, any solicitation or advertisement for medical treatment, or for referral for medical treatment, of an injury eligible for treatment under this chapter must: (1) be undertaken only by or at the direction of a health care provider; (2) prominently display or reference the legal name of the health care provider; (3) display or reference the license type of the health care provider, or in the case of a health care provider that is a business entity, the license type of all of the owners of the health care provider but need not include the names of the owners; (4) not contain any false, deceptive, or misleading information, or misrepresent the services to be provided; (5) not include any reference to the dollar amounts of the potential benefits under this chapter; and (6) not imply endorsement by any law enforcement personnel or agency.

(e) A violation of this subdivision is grounds for the licensing authority to take disciplinary action against the licensee, including revocation in appropriate cases.

(Minn. Session Law, Ch. 255, amending Minn. Stat. § 65B.54, subd. 6(a)-(e), at 1-2, Ex.

2 to Aff. of David W. Asp [Doc. No. 8-1]) (underscored in original).[1]

## A.    Legislative History

During the 2011-12 legislative session, in Senate File 2342 and House File 2749, the Minnesota Legislature discussed, and ultimately unanimously approved, the amended language in the No-Fault Act that Plaintiffs challenge in this suit. The legislative history of the 2012 amendments to the No-Fault Act reflects an effort by the insurance industry and health care providers, specifically chiropractors, to enact reforms to Minnesota's No-Fault Act.  (See Bob Johnson Comments, 3/16/12 Senate Commerce Comm. Hrng. at 1:02:18-1:03:44, Ex. 2 to Aff. of Hans A. Anderson [Doc. No. 20-1].)  The legislative record before the Court also reveals an intent to prohibit deceptive, misleading advertising in the context of automobile accidents.   Discussion at Senate committee hearings included specific references to the billboard advertising of 411-Pain and another similar medical and legal referral company known as "1-800-ASK GARY":

---

[1]The definition for the terms "runner, capper, or steerer, previously defined in Minn. Stat. § 609.612, subd. 1(c), was likewise amended as follows:

(c) "Runner," "capper," or "steerer: means a person who for a pecuniary gain directly procures or solicits prospective patients or clients through telephonic, electronic, or written communication, or in-person contact, at the direction of, or in cooperation with, a health care provider when the person knows or has reason to know that the provider's purpose is to fraudulently perform or obtain services or benefits under or relating to a contract of motor vehicle insurance. The term runner, capper, or steerer does not include a person who solicits or procures clients either through public media, or consistent with the requirements of section 65B.54, subdivision 6.

(Id.) (underscored in original).

**Sen. Paul Gazelka**:  I see billboards all around the metro down here, you know, certain health care providers, you know, "After you dial 911, dial 411- PAIN."  And I know it's all related to this coverage you're talking about now (no-fault insurance).  And I think the concept is good, I think people appreciate being able to get the coverage, but if you look at the differences in premium(s) for Minnesota versus our neighboring states, this I believe, is one of those areas.  But I guess I want you to address that. Certainly this was an abuse, over the years, I'm assuming it still is, but I think we need to have open dialogue about that.

**Bob Johnson, President of the Insurance Federation of Minnesota**: I could say a lot about this one. Hopefully will. I think just for today, maybe I comment the billboards [sic].  You mentioned two billboards. One, a police officer, "After you dial 911, dial 1-411 PAIN."  That's a Miami-based chiropractor that runs those billboards. There's also quite a few around town that's got a wrestler on it now and says "1-800 ASK GARY."  That's a Miami-based chiropractor. You know, it's a free market so people can come and do business here.  And it's clearly for auto accident victims that the solicitation is intended, because then the number, say if you're in a car accident, you have access to dollars under the no-fault system.

(1/25/11 Sen. Commerce & Consumer Protection Comm. Hrng. at 56:53-58:59, Ex. 1 to

Aff. of Rachel Morton [Ex. 9-1].)

Over a year later, on March 16, 2012, the Senate Commerce Committee held a

hearing on proposed amendments to the No-Fault Act.   Bob Johnson of the Insurance

Federation of Minnesota explained the changes, focusing on the proposed language

requiring advertisers to disclose health care providers' legal names or clinic names:

**Bob Johnson, President of the Insurance Federation of Minnesota:** The bill that you have before you, as amended, is a targeted improvement to 65B.54, Subd. 6.  That's a current No-Fault law that deals with unethical practices of providers who treat individuals in car accidents and the operative language as you have in front of you is the new paragraph (d) that - again - follows up on the current law that governs the advertisements and the behavior of providers to specifically deal with outreach advertisements, solicitations, activities of providers to deal with and require that the providers use their own legal name or the legal name of their clinic and to -

prohibits the use of fictitious names or assumed names and then also
requires that the legal name - that the provider has to be prominently
displayed or referenced in the solicitation and accurately describe what their
practice is.  So it's a follow up to current law that already deals with the
outreach solicitations, advertisements, and providers and again it's a pretty
selected, targeted reform.  It's one of the issues that we had on the table
before us amongst a number of issues.

(3/16/12 Senate Commerce Comm. Hrng. at 1:02:18-1:03:44, Ex. 2 to Anderson Aff.

[Doc. No. 20-1].)

In response to a question from Senator Ann Rest, inquiring about the nature

of the problem that the proposed statutory language sought to address, the Senate

bill's sponsor, Senator Gazelka stated:

. . . [M]y general response would be that perhaps there are some
    outliers in the industry that use advertisements out of Florida
companies that tend to get a lot of care directed their way, and perhaps they have a
lot of modalities that they run through the treatment and there's presenting not the
tightest language to correct some of that.  And no-fault is fairly broad and so we are
trying to deal with one of those issues.  We would really rather have them be more
specific than what I just said.

(3/16/12 Senate Commerce Comm. Hrng. at 1:05:18-1:06:05, Ex. 4 to Morton Aff.

[Doc. No. 9-1].)   Kevin Goodno, lobbying on behalf of the Minnesota Chiropractic

Association, stated that advertisements that fail to disclose the names of the health

care providers to whom consumers are referred, are deceptive:

**Kevin Goodno, Minnesota Chiropractic Association**: We have been
engaged in discussions for over a year trying to deal with and identify
various concerns both sides have with the current no-fault system.

From the Chiropractors' Association, the concern that we're trying to
address is deceptive advertising.  We want people, patients injured,
individuals who want to access care because they were injured in an
auto accident to know - when they call a number - when they go to
somebody who's advertised - that they know that it's either a provider
or a referral source or that it's very clear to them what the

7

> advertisement is and who those people are that are advertising their wares. And so for us, it's an issue of deceptive advertising making sure that people who are accessing health care know exactly the conduit by which they're accessing it. And in this case, the language would clarify and specify that you need to use - if you're a health care provider advertising - you need to use your legal name. We do have some concerns there are still some issues outstanding we're still, this is very technical in nature, and trying to figure out what works what doesn't work and we want to make sure there are no unintended consequences. We're committed to continuing to work with the Insurance Federation, Senator Gazelka, and other interested parties to try to make sure that this bill works the way it's intended to. So there is some modif– there are likely to be some modifications that need to be made to it as Senator Gazelka mentioned - but we do agree that there is a problem out there - or if not a problem - it's a perceived problem with deceptive practices by some providers out there.

(3/16/12 Senate Commerce Comm. Hrng. at 1:06:50-1:07:06; 1:07:11-1:08:28, Ex. 2 to

Anderson Aff. [Doc. No. 20-1].)

Also at this hearing, Bob Johnson of the Insurance Federation responded to a

question from Senator Terri Bonoff asking why a telephone number or internet

address might be considered misleading in this advertising context:

> **Bob Johnson, President of the Insurance Federation of Minnesota:**
> Mr. Chairman and Senator Bonoff, there are some names out there that have phone numbers and we believe, I think I can say jointly, believe that to be today misleading to consumers. To just see a phone number, it doesn't actually tell you what the business is or what you're doing. So if consumers just see a phone number, that's what the advertisement is, then that's confusing and potentially deceptive or misleading. And so it's a very targeted and I think it's a very limited circumstance where you are going to see that prospect coming up, but it does, and so that's what it is targeted to do is again, if it is not going to impact any provider who has a name that you're gonna be expected to have a provider name or clinic or operation or whatever, it is more likely so it's intended to focus in on that particular, that type of activity.

(3/16/12 Senate Commerce Comm. Hrng. at 1:09:33-1:10:30, Ex. 4 to Morton Aff. [Doc.

No. 9-1].)

Four days later, at a March 20, 2012 meeting of the House Committee on

Commerce and Regulatory Reform, State Representative Joe Atkins questioned whether the amended language would eliminate the ability of businesses like 411 Pain and 1-800-ASK GARY to do business in Minnesota.  (3/20/12 House Commerce Comm. Hrng. at 1:24:05-1:24:09, Ex. 3 to Morton Aff. [Doc. No. 9-1].)   Joel Carlson, speaking on behalf of the Association for Justice, indicated that the proposed language, "on its face," would have such an effect, and Representative Atkins, in response to his own question stated,  ". . . as I understand how they operate, it would eliminate their ability to do business in Minnesota." (Id. at 1:24:10-1:24:23.)  Representative Tim Sanders interjected, comparing the proposed amendments to past consumer/regulatory legislative efforts aimed at misleading advertising in other areas:

> **Rep. Tim Sanders:** Thank you, Mr. Chair, I think to that point and I think it was a couple years ago Representative Simon carried a bill that I worked with him where we dealt with this type of issue I believe when it dealt with locksmiths and florists where you would call a number in the phone book or something or look on Google.  You would Google "Blaine locksmith" and it would actually patch you to a company in New Jersey who would then send you back to a Blaine locksmith.  We fixed that a couple years ago for locksmiths and florists and I believe that this language is fairly similar at least looking. . . that may be some language to look at in that we were trying to fix that language for those industries and I see a similar problem, similar issue as it relates to 1-800-ASK GARY, I guess.

(Id. at 1:24:29-1:25:33.)

Also at the March 20 committee hearing, Representative Mike Nelson asked Representative Jim Abeler, the House sponsor of the bill, whether the proposed amendments would have any effect on limiting chiropractic or personal injury attorney mail solicitations with which automobile accident victims are frequently inundated. (Id. at 1:25:43-1:26:21.)  Representative Abeler responded that the objective of the proposed legislation was not to limit such solicitations, but to combat fraud, stating, "We're not trying to get rid of annoyance; we're trying to get rid of fraud."  (Id. at 1:26:21-1:26:35.)

On April 25, 2012, the proposed amendments were before the House on a floor

vote.  (Summary of Legislative History, Ex. 5 to Anderson Aff. [Doc. No. 20-1].)

Before the final vote was taken in the House, House members explained the purpose

behind the proposed amendments and expressed their bi-partisan support for the bill:

> **Statements of Representative Jim Abeler**:  We did agree on some
> advertising. In particular there is one group you might have heard the
> jingle 411 Pain that promises you $40,000. Pretty good deal. Not exactly
> the purpose of auto insurance is to give people $40,000. And so that's an
> example of an abuse. Some clinicians abuse the system and treat too long.
> We didn't get to that agreement on that part. There are some people who
> will run interference and go attract patients and give them rides and pay
> them money to go become patients whether they are injured very bad.
> They are called runners, cappers and steerers. That's a problem. The
> amendment that's before you is agreed upon by all parties and it involves
> advertising and adds some peace [sic] to the runners, cappers and steerers
> piece. In short it says advertising must be undertaken by health care
> providers, they must display the legal name with a health care provider or
> their clinic name. They must tell what kind of health provider they are. It
> must not be false, deceptive or misleading. It must not give reference to
> dollar amounts like the $40,000 and it must not imply endorsement by law
> enforcement or personnel. The second part has to do with giving teeth to
> the runners and cappers thing. I believe a letter by Ramsey County
> Attorney Choi brought forward the second part, in particular he endorses
> the bill as well. It gets rid, it allows them to actually prosecute people for
> fraudulently procuring and soliciting prospective patients. Members that's
> the bill.
>
> **Representative Joe Atkins**:   I wanted  to indicate the same sentiment as
> Representative Abeler's work.  I think  he is up to his eighth version on the effort.
> He has designated a certain area of advertising that he is targeting here.  And it
> does not affect other areas of advertising for legitimate, appropriate
> chiropractors, health care providers, lawyers. It raises some questions. I know I
> asked in committee Representative Abeler if it puts out of business the 1-800-
> ASK-GARYs, the 1-800-411-PAINs. I actually tried to call them or my assistant
> tried to call them on Monday - the Gary folks - and he was told they would get
> back to him in a few days. We represented that this could have a major impact
> on their business. So we haven't heard anything back from them.  But I appreciate
> the efforts and we will see where it all goes.

(4/25/12 House Floor Debate at 3:05:52-3:07:17; 3:09:02-3:10:05, Ex. 1 to Anderson Aff.

[Doc. No. 20-1].)  The House bill containing the proposed amendments to the No-Fault

Act, House File 2749, passed unanimously.  (Summary of Legislative History, Ex. 5 to

Anderson Aff. [Doc. No. 20-1].)

The bill was then returned from the House and was before the Senate for a final

vote on April 26, 2012.  Addressing the Senate prior to the final vote on Senate File 2342,

Republican and Democratic State Senators stated that the amendments were designed to

protect injured automobile accident victims from deceptive, misleading advertising at their

most vulnerable moments, following a car crash:

> **Sen. Paul Gazelka**:  This will protect individuals injured in a motor vehicle
> accident from solicitations and advertisements that exert undue influence,
> are deceptive and mislead.  First of all, by imposing new restrictions on
> advertisement targeted to individuals injured in a motor vehicle accident to
> insure that advertising is not misleading and clearly identifies the health care
> provider directing the solicitation. The second provision of the legislation
> strengthens the current law, prohibiting the use of runners, and cappers, and
> steerers in soliciting no-fault auto business for health care providers.
> Members, this is a collaboration of the MN Chiropractors Association, and
> the Insurance Federation, and other stakeholders.  It passed unanimously off
> the House floor. There's no opposition that I'm aware of now. This has been
> a work that's been in the making for probably ten years or longer and I'm
> just thrilled that we're able to get this done.

> **Sen. Ron Latz**:  Madam President, Members, I think this is a good bill, it's
> an appropriate protection for consumers and injured parties so they don't get
> taken advantage of at some of the most vulnerable moments, and I think
> deserves your widespread support today.

(Minnesota Senate Floor Session video archive, 4/26/12 at 10:27-11:41, http://www.senate.leg.

state.mn.us/media/media_list.php?ls=87&archive_year=2012&archive_month=

04&category=floor&type=video&ver=new#monthnav, accessed on 12/27/12.)[2]  The bill

---

[2]  Although the parties did not provide a transcript excerpt of the April 26, 2012
Senate Floor Vote in their exhibits, the Court accessed the video archive at the above-
continue...

passed unanimously and was signed by Governor Dayton on April 30, 2012.  (Minn.

Session Law, Ch. 255, amending Minn. Stat. § 65B.54, subd. 6(a)-(e), at 2, Ex. 2 to Asp

Aff. [Doc. No. 8-1].)

B.    **Plaintiffs' Advertisements**

In support of their motion for injunctive relief, Plaintiffs submit the Declaration of

Robert Lewin, the founder and president of 411 Pain [Doc. No. 12], and the Declaration of

Dr. Sergio Triana, an individual Plaintiff, and President of Plaintiff Truman Injury [Doc.

No. 11].  Mr. Lewin avers that 411 Pain has invested significant resources advertising in

Minnesota and has built name recognition in the Minnesota market.  (Lewin Decl. ¶ 7

[Doc. No. 12].)  He contends that the State of Minnesota does not require 411 Pain to have

a license in order to provide referrals for professional services, including referrals for

medical treatment (id. ¶ 8), and that 411 Pain's advertisements contain only truthful, non-

misleading information.  (Id. ¶ 10.)

In connection with his declaration, Lewin submitted the following examples of 411-

Pain's advertisements in Minnesota, arguing that they would be prohibited under the

amendments to the No-Fault Act, based on their references to specific dollar amounts of

possible benefits (id. ¶ 21):[3]

TOURISTS JUST LOVE THE MALL AND TOURISTS BRING CAR

---

[2]...continue

referenced website and transcribed the comments quoted above.  The Court takes judicial
notice of this portion of the legislative record.

[3]  The Court reprints the advertisements in the typeface form in which they appear
in Plaintiffs' exhibits.

ACCIDENTS. . . THE ILLEGAL U-TURNS, I CAN DEAL WITH. . . THE
15 MILES PER HOUR IN THE LEFT LANE, USED TO IT . . . BUT THIS
NEW ONE. . . LEFT TURN RIGHT BLINKER HAS ME SCREAMING
(SFX BEEP BEEP) . . . HOPEFULLY YOU AVOIDED THE ACCIDENT,
BUT IF NOT CALL GEORGE AT 1-800-411- PAIN. . . ROAD RAGE IS
NOT THE ANSWER . . . GEORGE IS. . . CAR ACCIDENT. . .
REMEMBER, AFTER 911, CALL 411. . . 1-800-411-PAIN. . . YOU MAY
BE ENTITLED TO FORTY THOUSAND DOLLARS IN INJURY AND
LOST WAGE BENEFITS . . . CALL 1-800-411-PAIN 24 HOURS A DAY
7 DAYS A WEEK . . . WHETHER IT'S SATURDAY, SUNDAY, EVEN
CHRISTMAS DAY . . . UNLIKE TOURISTS. . . 411-PAIN WORKS
EVERYDAY. . . CAR ACCIDENT . . . REMEMBER AFTER 911, CALL
411. . . 1-800-411-PAIN. . . YOU CAN CALL FROM HOME OR THE
HOSPITAL, BUT THE ABSOLUTE BEST TIME TO CALL 411 PAIN IS
FROM THE ACCIDENT SCENE . . . REMEMBER AFTER 911, CALL
411, 1-800-411-PAIN . . . 1-800-411-7-2-4-6.

(Ex. 1 to Lewin Decl. [Doc. No. 14 at 2] )

YOU'VE GOT A RETIREMENT PLAN, A BUSINESS PLAN, A
WEDDING PLAN, AND PROBABLY EVEN DINNER PLANS. . . BUT
DO YOU HAVE AN [sic] CAR ACCIDENT PLAN . . . CAR ACCIDENTS
HAPPEN . .. WHAT YOU PLAN TO DO NEXT CAN MAKE ALL THE
DIFFERENCE . . . CAR ACCIDENT . . . REMEMBER AFTER 911. . .
CALL 411. . . 1-800-411-PAIN. . . 1-800-411-PAIN <u>KNOWS ABOUT</u>
CAR ACCIDENTS. . . IT'S WHAT THEY DO. . . CALL 1-800-411-PAIN
24 HOURS A DAY 7 DAYS A WEEK FROM HOME, HOSPITAL OR
ACCIDENT SCENE. . . TIME OFF IS A CONCEPT 411 PAIN CAN'T
GRASP. . . CALL 1-800-411-PAIN AND LET THEM EXPLAIN THE UP
TO $40,000 IN INJURY AND LOST WAGE BENEFITS YOU MAY BE
ENTITLED TO. . . PLAN NOW. . . PROGRAM 1-800-411-PAIN INTO
YOUR PHONE NUMBER UNDER "ACCIDENT" . . . HERE'S
ANOTHER GOOD PLAN. . . DON'T DRINK AND DRIVE AND
ALWAYS WEAR YOUR SEATBELT. . . CAR ACCIDENT,
REMEMBER, AFTER 911 CALL 411.  1-800-411-PAIN.

(Ex. 2 to Lewin Decl. [Doc. No. 14 at 4]) (emphasis in original)

You know the deal . . .
Car accident . . . 411 PAIN
Slip and Fall. . . 411 PAIN
Work accident . . . 411 PAIN
Motorcycle accident . . . 1-800-411-PAIN. You can say it in your sleep.

Whether it's Saturday, Sunday or even Christmas Day. Call 1-800-411-PAIN. The best time to call 411 PAIN is from the accident scene. But you're going to be stressed, so grab your cell and punch in 1-800-411-PAIN. You want someone whose got your back. . . Call 1-800-411-PAIN. . . 411-PAIN has got your back. Call 1-800-411-PAIN 24 hours a day 7 days a week and let them explain the up to $40,000 injury benefits you may be entitled to . . . It's Sunday 5 p.m., there is no way 411 PAIN will answer the phone, WRONG! 411 PAIN works weekends. In an accident, and the guy with the tie says "let's not get our insurance companies involved." No good deed goes unpunished. . . always call 911 and always call 411. REMEMBER after 911 call 411, 1-800-411-PAIN.

(Ex. 3 to Lewin Decl. [Doc. No. 14 at 6].)

CAR ACCIDENTS HAPPEN. . . TELLING EVERYONE ON FACEBOOK ISN'T SOLVING YOUR PROBLEMS. . . CALLING 1-800-411-PAIN COULD . . . YOU MAY BE ENTITLED TO UP TO $40,000 IN INJURY AND LOST WAGE BENEFITS. . . THAT'S WHY AFTER 911 CALL 411. . . 1-800-411-PAIN. . . CALL 411-PAIN DIRECTLY FROM THE ACCIDENT SCENE. . . LISTEN, YOU CAN TWEET AND POST ABOUT THE CAR ACCIDENT LATER . . . CAR ACCIDENT. . . REMEMBER, AFTER 911, CALL 411. 1-800-411-PAIN.

(Ex. 4 to Lewin Decl. [Doc. No. 14 at 8]) (emphasis in original).

Lewin contends that the amended No-Fault Act "drastically limit[s] 411-Pain's ability to advertise in Minnesota. (Lewin Decl. ¶ 18.) He attests that the new law prohibits a referral service like 411-Pain from advertising its services, because 411-Pain does not advertise at the "direction" of any one health care provider. (Id. ¶ 19.) Even if the providers in 411-Pain's network did "direct" 411-Pain's advertising, Lewin contends that the new law "still would completely prohibit 411-Pain from advertising its services for medical referrals." (Id. ¶ 20.) Lewin attests that the requirement that 411-Pain disclose the individual provider names in its network of "dozens of health care providers" would not be feasible on 411-Pain's billboard advertisements, due to space limitations, nor in its

14

radio and television advertisements, due to time limitations.  (Id.)  Lewin also contends

that the new law's prohibition against advertising the specific dollar amounts of benefits

available would prohibit the advertisements found in Exhibits 1-4 of the Lewin

Declaration, as they contain such dollar-specific references.  (Id. ¶ 21.)

While the advertisements found in Exhibits 1-4 of the Lewin Declaration are radio

ads (id. ¶ 11), 411-Pain also advertises on television.  Some of 411-Pain's television

advertisements feature a vehicle crash, an actor appearing as a police officer or EMT, and

an ambulance – all of which "convey[] to viewers that if they call the phone number

associated with 800-411-PAIN or go to 411Pain.com, then they can get help after being

injured in an accident."  (Id. ¶ 16.)  Lewin attests that television ads portraying law

enforcement officers contain a "conspicuous and prominent disclaimer" that the law

enforcement officer depicted is a "paid actor."  (Id.)

Lewin further contends that the enforcement mechanism found in the new law –

which subjects health care providers to disciplinary action from a professional licensing

board for failure to abide by the new law's provisions – will cause health care providers to

refrain from associating with 411-Pain for fear of disciplinary action.  (Id. ¶ 23.)   In

support of this contention, Plaintiffs submit the Declaration of Mark Soll, D.C., a

Minnesota licensed chiropractor who would like to become part of the 411-Pain referral

network.  (Decl. of Mark Soll ¶ 2 [Doc. No. 13].)   Soll asserts that he will not join 411-

Pain's network due to his concern that, in light of the changes to the No-Fault Act, the

Minnesota Board of Chiropractic Examiners would take disciplinary action against him.

(Id. ¶ 5.)

Chiropractor Sergio Triana attests that his clinic, Truman Injury, is part of 411-Pain's referral network, and would like to remain a part of that network.  (Decl. of Sergio Triana ¶ 4 [Doc. No. 11].)  In addition, Dr. Triana contends that, but for the new law, Truman Injury itself would create advertisements referencing specific dollar amounts of recovery, informing car accident victims that they "may be entitled to benefits of up to $40,000."  (Id. ¶ 6.)  Similarly, but for the new law, Triana states that he "would create and run advertisements through Truman Injury" depicting police officers or EMT personnel, with a "paid actor" disclaimer.  (Id. ¶ 7.)   However, in light of the new provisions in the No-Fault Law subjecting health care providers to disciplinary action for violations of the law, Triana contends that he will refrain from creating and running such advertisements. (Id. ¶ 8.)

Although the amendments to Minnesota's No-Fault Act were signed by Governor Dayton on April 30, 2012, Mr. Lewin, President of 411-Pain, contends that he only "became aware of a change" to the law in late October 2012  (Lewin Decl. ¶ 17 [Doc. No. 12].)   Plaintiff Triana likewise attests that he "recently became aware" of the change in law.  (Triana Decl. ¶ 2 [Doc. No. 11].)   Plaintiffs commenced this lawsuit on December 4, 2012, and filed the instant motion the following day.

## II.    DISCUSSION

Pursuant to Fed. R. Civ. P. 65, Plaintiffs move the Court for the entry of a preliminary injunction enjoining Defendants from enforcing Minn. Stat. § 65B.54, Subdivision 6(d)(1)-(3), (5), and (6).  (Pls.' Mot. for Prelim. Inj. [Doc. No. 6].)   As noted, these provisions require that, in the context of advertising benefits under the State's No-

Fault system, any advertisement or solicitation for medical treatment or referral for

medical treatment of an injury must:

(1)     be undertaken only by or at the direction of a health care
        provider;
(2)     prominently display or reference the legal name of the health
        care provider;
(3)     display or reference the license type of the health care
        provider, or in the case of a health care provider that is a
        business entity, the license type of all of the owners of the
        health care provider but need not include the names of the
        owners;

                            ***

(5)     not include any reference to the dollar amounts of the potential
        benefits under this chapter; and
(6)     not imply endorsement by any law enforcement personnel or
        agency.[4]

(Minn. Session Law, Ch. 255, amending Minn. Stat. § 65B.54, subd. 6(d)(1)-(3), (5)-(6),

Ex. 2 to Asp Aff. [Doc. No. 8-1].)

        Plaintiffs contend that, absent the issuance of a preliminary injunction, the amended

No-Fault Act will "completely prohibit Plaintiff 411-Pain from truthfully advertising its

medical-referral services."  (Pls.' Mem. Supp. Mot. for Prelim. Inj. at 1 [Doc. No. 7].)

For instance, Plaintiffs argue that by prohibiting references to specific dollar amounts of

potential recovery, the amended law stifles their truthful speech which advertises potential

benefits of "up to $40,000 in medical-expense and wage-loss benefits after an accident."

(Id. at 2-3; 14.)  In addition, Plaintiffs argue that the No-Fault Act's new prohibitions

---

[4]  Plaintiffs do not seek to enjoin Part (4) of Subdivision 6(d), which prohibits
advertisements containing false, deceptive, or misleading information, or
misrepresentation of the services provided (id., subd. 6(d)(4)).  (Pls.' Mot. at 1 [Doc. No.
6].)

against the implied endorsement of law enforcement impinge their speech.  (Id. at 14.)

Likewise, Plaintiffs take issue with the provisions requiring that advertisements be

undertaken at the direction of a health care provider, and the related provisions that require

advertisers to identify the legal name and license type of health care provider to whom

consumers are referred.  (Id. at 17-19.)  These prohibitions, Plaintiffs contend, violate the

First Amendment, which does not permit such bans on commercial speech based on the

identity of the speaker or the content of the message.  (Id.) (citing Sorrell v. IMS Health,

Inc., 131 S. Ct. 2653, 2671 (2011)).   Asserting  that they have demonstrated a high

likelihood that they will prevail on the merits, Plaintiffs move the Court to grant their

motion for a preliminary injunction and to enjoin Defendants from enforcing the new law.

(Id.)

       In response, Defendants argue that the No-Fault provisions at issue do not run afoul

of the First Amendment.  Rather, Defendants argue, the law strengthens prohibitions

against misleading advertising of medical and legal referral services directed to automobile

accident victims.  (Defs.' Opp'n Mem. at 1 [Doc. No. 19].)  They contend that the Act

represents a valid prohibition on speech concerning misleading and unlawful activity.  (Id.

at 12.)  Arguing that Plaintiffs cannot show that they are likely to prevail on the merits and

cannot demonstrate irreparable harm, Defendants argue that Plaintiffs' motion for a

preliminary injunction must be denied.

### A.      Standard of Review

       A preliminary injunction "is an extraordinary remedy never awarded as a matter of

right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 9 (2008). In Planned

Parenthood Minnesota v. Rounds, the *en banc* Eighth Circuit clarified the analysis for preliminary injunctive relief. 530 F.3d 724 (8th Cir. 2008) (*en banc*). The court noted that under its earlier *en banc* decision in Dataphase Systems, Inc. v. C L Systems, Inc., issuance of preliminary injunctive relief

> depends upon a "flexible" consideration of (1) the threat of irreparable harm to the moving party; (2) balancing this harm with any injury an injunction would inflict on other interested parties; (3) the probability that the moving party would succeed on the merits; and (4) the effect on the public interest.

Rounds, 530 F.3d at 729 (citing 640 F.2d 109, 113 (8th Cir.1981) ( en banc )).

As to the factor of success on the merits, the Eighth Circuit has held that when considering a challenge to a "duly enacted state statute," a court must "make a threshold finding that [the plaintiff] is likely to prevail on the merits." Id. at 732–33.  This "likely to prevail" standard requires the movant to make a "more rigorous threshold showing" than required under the "fair chance" test applicable to a motion for a preliminary injunction that seeks to enjoin something other than a state or federal statute.  Id. at 730, 733 n.6.  A higher standard to enjoin legislation is warranted, as such a standard "'reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'"  Id. at 732 (quoting Able v. United States, 44 F.3d 128,131 (2d Cir. 1995) (per curiam)).  "If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other Dataphase factors."  Id.

**B.     "Likely to Prevail on the Merits" <u>Dataphase</u> Factor**

The First Amendment protects against government regulations "that suppress,

disadvantage, or impose differential burdens upon speech because of its content." <u>Turner

Broad. Sys., Inc. v. F.C.C.</u>, 512 U.S. 622, 641–42 (1994). "Both commercial and

noncommercial speech are protected by the First Amendment, although they receive

different degrees of protection." <u>Clear Channel Outdoor, Inc. v. City of St. Paul</u>, 02-CV-

1060 (DWF/AJB), 2003 WL 21857830, *5 (D. Minn. Aug. 4, 2003) (citing <u>Central

Hudson Gas & Elec. Corp. v. Public Serv. Comm'n</u>, 447 U.S. 557 (1980)).  Content-based

government regulations are considered "presumptively invalid," <u>R.A.V. v. City of St. Paul</u>,

505 U.S. 377, 382 (1992), whereas "non-content based regulation and regulation of

commercial speech – expression solely related to the economic interests of the speaker and

its audience – are subject to intermediate scrutiny."  <u>See</u> <u>United States v. Caronia</u>, __ F.3d

__, No. 09-5006-cr, 2012 WL 5992141, *11 (2d Cir. Dec. 3, 2012) (citing <u>Turner Broad.</u>,

512 U.S. at 642; <u>Central Hudson</u>, 447 U.S. 557, 563-64)).  Deceptive or unlawful

commercial speech is entitled to no First Amendment protection at all.  <u>Central Hudson</u>,

447 U.S. at 563-64.

Courts generally review the regulation of commercial speech under the four-

pronged test set forth in <u>Central Hudson</u>, asking whether: (1) the expression is protected

(i.e., lawful and not misleading); (2) the government interest is substantial; (3) the

regulation directly advances the government's interest; and (4) that interest could be

served by a more limited exception.  <u>Id.</u> at 566; <u>see also</u> <u>R.J. Reynolds Tobacco Co. v.

FDA</u>, 696 F.3d 1205, 1217 (D.C. Cir. 2012) (discussing <u>Central Hudson</u> test).

Plaintiffs urge the Court to apply "heightened judicial scrutiny" to the provisions at issue, citing the Supreme Court's recent decision in Sorrell. (Pls.' Mem. at 11-12 [Doc. No. 7].)  In Sorrell, a 6-3 decision, the Supreme Court examined a Vermont law that prohibited pharmaceutical companies and related entities from using prescriber-identifying information for marketing purposes. 131 S. Ct. at 2661-62.   Applying a two-part analysis, the Sorrell Court first considered whether the government regulation was content- and speaker-based. Id. at 2662-64.  Concluding that the Vermont statute created content- and speaker-based restrictions on speech, the Supreme Court next applied "heightened scrutiny" to the statute without expressly "decid[ing] the level of heightened scrutiny to be applied, that is strict, intermediate, or some other form of heightened scrutiny." See Caronia, __ F.3d at __, 2012 WL 5992141 at *11 (discussing Sorrell's two-part analysis). Whatever the form of  "heightened" scrutiny, the Supreme Court ultimately concluded that the statute was unconstitutional even under the intermediate Central Hudson standard. 131 S. Ct. at 2667 (stating, "To sustain the targeted, content-based burden [the Vermont statute] imposes on protected expression, the State must show at least that the statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest.")[5] The Court thus employs the two-part approach set forth in Sorrell, which incorporates the Central Hudson standard in the second half of the analysis.

---

[5]  Specifically, the majority concluded that Vermont's asserted interests in protecting physician confidentiality, protecting physicians from harassing sales behaviors, and protecting the doctor-patient relationship did not support the burden placed on protected expression. Id. at 2668-2670.  In addition, the majority found that the statute did not advance Vermont's stated policy goals of lowering the costs of medical services and promoting public health. Id. at 2670.

### 1. Whether the Statutory Provisions are Content- and Speaker-Based Restrictions on Speech

Making a determination of whether a statute is content- and speaker-neutral "is not always a simple task." <u>Turner Broad.</u>, 512 U.S. at 642.  "We have said that the 'principal inquiry in determining content neutrality . . . is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys.'" <u>Id.</u> (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989)).  "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." <u>Id.</u> (citations omitted).

Plaintiffs contend that the amended law is both a content- and speaker-based prohibition on speech.  (Pls.' Mem. at 12 [Doc. No. 7].)  The Court agrees as to Parts (1), (5), and (6) of Subdivision 6, as these parts relate to speech prohibitions.  (Minn. Session Law, Ch. 255, amending Minn. Stat. § 65B.54, subd. 6(d)(1), (5) & (6) Ex. 2 to Asp Aff. [Doc. No. 8-1].)  The language in Subdivision 6(d)(1) requires that any referrals for medical treatment of an automobile accident injury must be undertaken only by or at the direction of a health care provider.  (<u>Id.</u> at subd. 6(d)(1).)  This prohibition is speaker-based because it only applies to a narrow class of speakers – those who are soliciting referrals for medical treatment of an automobile accident injury, but not at the direction of a health care provider.  As Plaintiffs' counsel argued at the motion hearing, amended Minn. Stat. § 65B.54 applies to only those entities and providers who advertise in the context of automobile accidents, as opposed to slip and fall or workplace accidents.

In Part (5) of Subdivision 6(d), the amended statute prohibits references to specific

dollar amounts of potential recovery.  (Id. at subd. 6(d)(5).)  This prohibition therefore distinguishes between favored speech referring to the possibility of economic loss benefits in general, and disfavored speech referring to specific dollar amounts of economic loss benefits.

Subdivision 6(d)(6) of the amended No-Fault Act bans advertisements that imply law enforcement endorsement. (Id. at subd. 6(d)(6).)  This prohibition thus prohibits the content of such speech.

The amendments found in Parts (2) and (3) of Subdivision 6 require the disclosure of the health care provider's legal name and license type.  On the subject of disclosure requirements, the Supreme Court has held that advertisers' rights are adequately protected as long as the disclosure requirements in question are reasonably related to the government interest in preventing consumer deception.  Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 651 (1985).  All manner of disclosure requirements designed to protect consumers from misleading commercial speech, or misleading omissions, are found in countless areas of federal and state law, from provisions of the Fair Debt Collection Practices Act requiring debt collectors to meaningfully disclose their identities to consumers, 15 U.S.C. § 1692d(6), to a Minnesota statute requiring that advertisements for membership camping contracts prominently disclose the name, address, and phone number of the membership camping operator on whose behalf the advertisement is distributed.  Minn. Stat. § 82A.09, subd. 3(2) (2009). Addressing certain disclosure requirements in a rule of professional conduct that required attorneys who advertised contingency-fee services to indicate that a losing client might remain

responsible for certain litigation fees and costs, the Zauderer Court observed,

> Thus, in virtually all our commercial speech decisions to date, we have emphasized that because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, "warning[s] or disclaimer[s] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception."  In re R.M.J., 455 U.S. 191, 201 (1982).  Accord, Central Hudson, 447 U.S. at 565; Bates v. State Bar of Arizona, 433 U.S. 350, 384 (1977); Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 772, n. 24 (1976).

Zauderer, 471 U.S. at 651.

In Milavetz, Gallop & Milavetz, P.A. v. United States, 130 S. Ct. 1324, 1340-41 (2010), the Supreme Court reiterated its holding in Zauderer that the standard of scrutiny to be applied to a commercial speech challenge to disclosure provisions in a federal bankruptcy statute was whether the requirements were reasonably related to the government's interest in preventing consumer deception.

The parties disagree, however, about the standard applicable to the new requirements found in Subdivision 6(d)(2)-(3).  Defendants argue that the slightly lower, "reasonably related" standard applies (Defs.' Opp'n Mem. at 13-14), while Plaintiffs contend that the heightened Sorrell standard applies.  (Pls.' Mem. at 13 [Doc. No.7].) Because the outcome here is the same under the remaining three Central Hudson factors – an analysis that is included in the higher Sorrell standard – the Court will apply the Central Hudson factors to these portions of the amended No-Fault Act.

### 2.    Applying the **Central Hudson** Factors

Under a heightened standard, the Court applies Central Hudson's test to determine whether the restrictions on commercial speech in certain provisions of Minnesota's

amended No-Fault Act are consistent with the First Amendment.  <u>Sorrell</u>, 131 S. Ct. at

2667-68.   The government bears the burden of justifying whether a content-based law is

consistent with the First Amendment.  <u>Id.</u> at 2667.

> ### a.      Whether the Speech is Misleading or Concerns Unlawful Activity

The threshold question under the four-part <u>Central Hudson</u> test is whether the

speech in question is misleading or concerns unlawful activity.  <u>Central Hudson</u>, 447 U.S.

at 566.   "For commercial speech to come within [the First Amendment], it at least must

concern lawful activity and not be misleading."  <u>Id.</u>  Writing for the dissent in <u>Sorrell</u>,

Justice Breyer observed, "The fact that the Court normally exempts the regulation of

'misleading' and 'deceptive' information even from the rigors of its 'intermediate'

commercial speech scrutiny testifies to the importance of securing 'unbiased information. .

. .'"  <u>Sorrell</u>, 131 St. Ct. at 2681 (6-3 decision) (Breyer, J., dissenting) (citation omitted).

". . . [W]hen the particular method or content of the advertising suggests that it is

inherently misleading or when experience has proved that in fact such advertising is

subject to abuse, the States may impose appropriate restrictions.  Misleading advertising

may be prohibited entirely."  <u>In re R.M.J.</u>, 455 U.S. 191, 203 (1982).   "Inherently

misleading" speech is that which "inevitably will be misleading" to consumers.  <u>Bates v.

State Bar of Ariz.</u>, 433 U.S. 350, 372 (1977).

While Plaintiffs argue that like the pharmaceutical manufacturers in <u>Sorrell</u>, they

are uniquely disfavored speakers under the new No-Fault provisions (<u>see</u> Pls.' Mem. at 12

[Doc. No. 7]), Plaintiffs' argument overlooks a significant distinction with <u>Sorrell</u>.  In

Sorrell, the State of Vermont in no way argued that the restricted activity was false or misleading, nor that the challenged provision would prevent false or misleading speech. 131 S. Ct. at 2672.  Here, not only do Defendants argue that the restricted activity is false and/or misleading, the legislative record supports their position.   For example, the record contains comments from legislators and public stakeholders noting that, as to the referral advertising in question, consumers have little understanding, if any, of what type of services are advertised, who the advertiser is, or whether consumers are entitled to recover a specific dollar amount.   Prior to the Senate floor vote on the amended No-Fault language, the Senate bill's sponsor commented that the bill would "impos[e] new restrictions on advertisements targeted to individuals injured in a motor vehicle accident to insure that advertising is not misleading and clearly identifies the health care provider directing the solicitation."  (Minnesota Floor Session Video Archive, 4/26/12 at 10:27-11:41.)

Kevin Goodno, a lobbyist for the Minnesota Chiropractic Association, testified in a committee hearing on the bill, "when [persons injured in automobile accidents] call a number – when they go to somebody who's advertised - that they [should] know that it's either a provider or a referral source or that it's very clear to them what the advertisement is and who those people are that are advertising their wares."  (3/16/12 Senate Commerce Comm. Hrng. at 1:06:50-1:07:06; 1:07:11-1:08:28, Ex. 2 to Anderson Aff. [Doc. No. 20-1].)  Underscoring the concern for consumer protection, Senator Ron Latz offered his support for the bill, stating, "[I]t's an appropriate protection for consumers and injured parties so they don't get taken advantage of at some of the most vulnerable moments. . . ."

26

(Minnesota Senate Floor Session Video Archive,  4/26/12 at 10:27-11:41.)

The Court finds that the advertising which the amended No Fault Act seeks to restrict is inherently misleading.  Under <u>Central Hudson</u>, deceptive and misleading commercial speech may be freely regulated.  447 U.S. at 563-64.  The examples of radio advertising that Plaintiffs have submitted to the Court fail to identify that 411-Pain is a health care referral source, much less that the health care in question is chiropractic care.  (411-Pain Advertisements, Exs. 1-4 to Lewin Decl. [Doc. No. 14].)  Given the content of these advertisements, consumers hearing such ads have no idea what 411-Pain is or does.  Instead, 411-Pain's advertisements urge consumers to call 411-Pain immediately, at the accident scene, second only to dialing 911.[6]  (411-Pain Advertisements, Exs. 1-4 to Lewin Decl. [Doc. No. 14].)

In addition, the ads refer to a possible entitlement of "up to $40,000 in injury and lost wage benefits."  (411-Pain Advertisements, Exs. 2 & 4 to Lewin Decl. [Doc. No. 14].)  While Plaintiffs insist that these representations are truthful, based on the economic loss limits found in Minn. Stat. § 65B.44, Subdivision 1, the Court nonetheless finds them misleading.  411-Pain's specific dollar-amount references imply that consumers will receive a floor of benefits, potentially up to $40,000, when, in fact, many consumers will receive nothing.  Conversely, these representations also imply that $40,000 represents the ceiling of possible benefits, when, in fact, a variety of other possible benefits may be

---

[6] Two of the advertisements suggest that consumers store 411-Pain's number in their cell phones, in anticipation of a car accident.  (411-Pain Advertisements, Exs. 2 & 3 to Lewin Decl. [Doc. No. 14].)

available to  automobile accident victims – collision coverage, liability coverage, uninsured motorist coverage, and possibly stacked coverage for motorists not at fault, who have stacked policies.  While an attorney or insurance agent qualified to advise clients about coverage could convey this information, 411-Pain's advertisements of "up to" $40,000 in economic loss benefits misleadingly limit the universe of information.  Just as 411-Pain's advertisements may prompt some consumers to unnecessarily seek benefits, the proscribed advertising may also keep some consumers from obtaining <u>more</u> benefits.

Furthermore, certain of 411-Pain's television advertisements feature a vehicle crash and an actor portraying the role of a police officer or EMT "with an ambulance conveying to viewers that if they call the phone number associated with 800-411-PAIN or go to 411Pain.com, then they can get help after being injured in an accident."  (Lewin Decl. ¶ 16 [Doc. No. 12].)  While these ads include a disclaimer stating "Paid Actor" (<u>id.</u> ¶ 16), this depiction of  law enforcement or EMT personnel nonetheless implies their endorsement of 411-Pain's services.

In addition, the language found in Subdivision 6(d)(1) of the amended statute requiring that advertising be undertaken at the direction of a provider represents a valid prohibition on speech concerning unlawful activity.  411-Pain contends that it does not advertise "at the direction of" the providers to whom it refers consumers.  (Lewin Decl. ¶ 19 [Doc. No. 12].)  However, Minnesota law vests authority in the commissioner of health to "adopt rules restricting financial relationships or payment arrangements involving health care providers under which a person benefits financially by referring a patient to another person, recommending another person, or furnishing or recommending

28

an item or service."  Minn. Stat. § 62J.23.  The provision in Part (1) of Subdivision 6(d)

prohibiting an entity from independently advertising and referring persons for medical

treatment – not at the direction of a health care provider – thus is aimed at forbidding

practices that are both misleading and possibly unlawful.  The Court concludes, for all of

these reasons, that all of the speech sought to be restricted is, at best, misleading, and is

also possibly unlawful.

<strong>b.      Whether the Asserted Governmental Interest is Substantial</strong>

Under the second Central Hudson factor, the Court determines whether the State's

asserted interest is substantial.  447 U.S. at 565-66.   The lone provision of Subdivision 6

(d) which Plaintiffs do not challenge – found in Part (4), prohibiting advertisements

containing false, deceptive, or misleading information – clearly and unambiguously

identifies a substantial governmental interest in protecting the public from misleading and

false advertising.  (Minn. Session Law, Ch. 255, amending Minn. Stat. § 65B.54, subd.

6(d)(4) Ex. 2 to Asp Aff. [Doc. No. 8-1].) Plaintiffs argue, however, that the legislative

record merely refers to the advertising at issue as "potentially deceptive or misleading."

(Pls.' Mem. at 15 [Doc. No. 7]) (citing Exs. 3 &4 to Morton Aff.)  The Supreme Court has

held that mere labeling of certain commercial speech as "potentially misleading" cannot

supplant the state's burden of identifying a substantial state interest in restricting it.

Ibanez v. Fla. Dep't of Bus. and Reg., 512 U.S. 136, 146 (1994).  The Court finds here that

the statute expressly refers to false, deceptive, or misleading advertising.  (Minn. Session

Law, Ch. 255, amending Minn. Stat. § 65B.54, subd. 6(d)(4), Ex. 2 to Asp Aff. [Doc. No.

8-1].)   While some statements in the record refer to "potentially misleading" speech,

29

comments in the record also speak to misleading advertising in the present tense, and to the State's interest in protecting against it.  (See Bob Johnson Comments, 3/16/12 Senate Commerce Comm. Hrng. at 1:09:33-1:10:30, Ex. 4 to Morton Aff. [Doc. No. 9-1]); Kevin Goodno Comments, 3/16/12 Senate Commerce Comm. Hrng. at 1:06:50-1:07:06; 1:07:11-1:08:28, Ex. 2 to Anderson Aff. [Doc. No. 20-1].)

    In addition to the asserted overall governmental interest of preventing fraudulent or misleading advertising aimed at persons injured in motor vehicle accidents, the State has a substantial interest in ensuring that accident victims, who may be under duress, have a clear understanding of who they are contacting for aid and treatment.  (Defs.' Opp'n Mem. at 13 [Doc. No. 19].)  In addition, the State has an interest in requiring that only parties actually capable of providing health care treatment direct the advertising of their health care services.  (Id.)  The language at issue in the amended No-Fault language, applicable to health care providers and those acting at their direction, is aimed at protecting consumers.  (Minn. Session Law, Ch. 255, amending Minn. Stat. § 65B.54, subd. 6(d)(1), Ex. 2 to Asp Aff. [Doc. No. 8-1].) A state's interest "in ensuring the accuracy of commercial information in the marketplace is substantial."  Edenfield v. Fane, 507 U.S. 761, 769 (1993).  In Sorrell, while finding the Vermont statute unconstitutional, the Supreme Court observed, "Indeed the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech.'" 131 S. Ct. at 2672 (quoting City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 426 (1993)).

States have a "compelling interest in the practice of professions within their boundaries." Florida Bar v. Went For It, Inc., 515 U.S. 618, 625 (1995).  Therefore, to protect public health, safety, and other interests, states possess broad licensing and regulatory powers.  Id.  The Supreme Court has "given consistent recognition to the State's important interests in maintaining standards of ethical conduct in the licensed professions." Edenfield, 507 U.S. at 770.  In Minnesota, the Chiropractic Practice Act, Minn. Stat. § 148.01-108, establishes the Board of Chiropractic Examiners, and requires licensed chiropractors to adhere to professional standards found in the Act, as well as in the Rules of the Board of Chiropractic Examiners, Minn. Adm. R. 2500. Chiropractors are also obliged to follow certain provisions of the No-Fault Act, Minn. Stat. § 65B.   Under the non-amended No-Fault Act, the section regarding "Unethical Practice," addresses only the conduct of  licensed health care providers, or those acting on their behalf.  Minn. Stat. § 65B.54, subd. 6(a).  The enforcement provision of the statute, in Subdivision 6(d) provides the licensing authority the power to take disciplinary action against the licensee, including revocation.  Id., subd. 6(d).  As Defendants note, under the non-amended statute, they are only empowered with the authority to enforce Subdivision 6(d) by seeking discipline against licensed chiropractors.  (Defs' Opp'n Mem. at 19-11 [Doc. No. 19].)   Absent the provisions in the amended No-Fault Act, advertisers and referral sources are permitted to make an end-run around the regulations and prohibitions otherwise enforceable only against licensed chiropractors.  For all of the reasons set forth above, the Court thus finds the State's asserted interests are substantial.

### c.    Whether the Statute Directly Advances the Asserted Governmental Interest

The Court next considers whether the contested provisions in the amended statute directly advance the asserted governmental interest. Central Hudson, 447 U.S. at 565-66. The amended language in Subdivision 6(d)(2) and (3) directly advances the state interest in prohibiting misleading advertising and ensuring that accident victims have a clear understanding of who they are contacting for aid and treatment. The amended No-Fault provisions advance that interest by requiring advertisements for medical treatment, or referrals for such treatment, to clearly identify the name of the health care provider and the provider's license type. (Minn. Session Law, Ch. 255, amending Minn. Stat. § 65B.54, subd. 6(d) (2)-(3), Ex. 2 to Asp Aff. [Doc. No. 8-1].) So too does the requirement in Part (1) of Subdivision 6(d) which requires that advertisements must be undertaken only by or at the direction of a health care provider. This provision advances the State's interest so that car accident victims have a full understanding that the person or entity to whom they may be referred for treatment is also directing the advertisement.

Part (5) of Subdivision 6(d) also advances the government interest by ensuring that advertisements do not entice, induce, or even lull consumers into believing that an automobile accident may lead to a particular sum of compensation. This subdivision therefore forbids references to specific dollar amounts of benefits potentially available to them.

The prohibition against the implied endorsement of law enforcement in

advertisements, found in Subdivision 6(d)(6), in an appropriate restriction on misleading advertising. This provision advances the state's interest in protecting consumers from misleading and deceptive advertising by ensuring that consumers have a clear understanding of who they are contacting and are not unduly influenced by an implied endorsement. Ads that imply law enforcement endorsement extend a misleading aura of authorized approval to the services in question. To the extent that Plaintiffs contend that this ban on advertisements impermissibly extends to images of law-enforcement personnel, the statute does not ban the use of such images altogether – it merely bans the implication of law enforcement endorsement of a product. The Court concludes that Part (6) of Subdivision 6(d) also advances a substantial governmental interest.

### d.    Whether the Statute is Narrowly Drawn

Under the final Central Hudson factor, the Court must determine whether the statute is "narrowly drawn" and not more extensive than necessary to serve the governmental interest. 447 U.S. at 565-66. The government is precluded from "completely suppress[ing] information when narrower restrictions on expression would serve its interests as well." Id. at 565.

The Court finds that the contested provisions in the amended No-Fault Act are narrowly drawn. The language at issue in Subdivision 6(d)(1)-(3) directly advances the governmental interest that only parties actually capable of providing treatment are advertising that treatment (Defs' Opp'n Mem. at 13 [Doc. No. 19]), and is not more extensive than necessary. The prohibitions in Parts (5) and (6) of Subdivision 6(d),

33

concerning restrictions against advertising specific dollar amounts and implied law enforcement endorsement are also narrowly drawn to achieve the government interest of providing consumers with non-misleading, non-deceptive information.

While the legislative history reveals legislators' awareness that these reforms would "have a major impact" on the business of companies such as 1-800-ASK GARY (Rep. Atkins' Statements, 4/25/12 House Floor Debate at 3:09:02-2:10:05, Ex. 1 to Anderson Aff. [Doc. No. 20-1]), the amendments are narrowly tailored and do not prevent Plaintiffs from advertising, despite Plaintiffs' contentions to the contrary. In fact, 411-Pain's owner and founder, Robert Lewin apparently concedes that the new No-Fault Act will prohibit 411 Pain from advertising only "some of its accident-assistance services" – not all. (Lewin Decl. ¶ 19 [Doc. No. 12].) Referrals for medical treatment will be affected, Lewin contends, because 411 Pain does not advertise at the "direction" of "any one health care provider." (Id.) Defendants, however, disagree, contending that "[i]t stands to reason that a health care provider who pays a third party for advertising services is directing that third party to advertise on their behalf, which is clearly allowed under part (1) of Subdivision 6(d)." (Defs.' Opp'n Mem. at 12 [Doc. No. 19].) If 411-Pain is concerned about whether its advertisements are undertaken at the direction of the health care providers within its network, it may presumably draft contractual language to that effect in its agreements with health care providers.

Lewin also contends that the new law will ban "some of the content" of 411-Pain's current advertising – specifically current advertising that references specific

34

dollar amounts.  (Id. ¶ 21.)  However, the provision in question, Part (5) of

Subdivision 6(d), is narrowly drawn.   Plaintiffs may still advertise the general

availability of potential economic benefits under Minnesota's No-Fault Act.

411-Pain also argues that the requirement that it list the providers and identify

their provider types is overly burdensome due to the sheer volume of providers in its

network.  (Lewin Decl. ¶ 20 [Doc. No. 12].)   However, 411-Pain has provided no

evidence showing the number of chiropractors with whom it does business in

Minnesota.  Regardless, while this restriction may change the nature of some of 411-

Pain's advertisements, it does not eliminate 411-Pain's ability to advertise in

Minnesota, and is narrowly drawn to achieve the government's interest.   While

Plaintiffs argue that this disclosure requirement is unduly burdensome, the Court

finds the disclosure consistent with Zauderer and Milavetz.  See R.J. Reynolds, 696

F.3d at 1215-17 (distinguishing Zauderer and Milavetz where the disclosure

requirement of graphic warnings on cigarette advertising was not a remedial measure

designed to correct false or misleading claims).  Requiring health care providers who

target consumers at their most vulnerable moments to disclose information to better

inform the consumers is a measure that advances this substantial government interest.

The record reflects that the Legislature narrowly drafted the legislation with the

goal of preventing misleading advertising and ensuring that consumers understand

who they are contacting and what services are offered. During the House Committee

on Commerce and Reform hearing, in response to a legislator's question as to whether

the amended language would eliminate chiropractic mass mail solicitations following

35

a motor vehicle accident, the House bill's sponsor, Representative Abeler, explained that it would not: "We're not trying to get rid of annoyance; we're trying to get rid of fraud." (3/20/12 House Commerce Comm. Hrng. at 1:26:21-1:26:35, Ex. 3 to Morton Aff. [Doc. No. 9-1].)  The Court finds that the amendments in question are narrowly drawn to achieve the State's asserted interests.

Accordingly, the Court concludes that Plaintiffs are not likely to prevail on the merits, for all of the reasons set forth above.   While the amendments are content- and speaker-based, they pass the heightened judicial scrutiny of <u>Central Hudson</u> and do not violate the First Amendment.

As previously discussed, when considering a motion for a preliminary injunction seeking to enjoin a duly-enacted state statute, the Eighth Circuit requires a higher standard of review, out of deference to the legislative process. <u>Rounds</u>, 530 F.3d at 732.  Indeed, the legislative history of the new No-Fault provisions reflects that, at the time of the final Senate vote, efforts to reform Minnesota's No-Fault Act had been underway for ten years or more.  (Sen. Gazelka Comments, Minnesota Senate Floor Session video archive, 4/26/12 at 10:27-11:41.)   The specific amendments at issue were under discussion for over a year in two separate bills, in at least three committees.   (<u>See</u> Goodno Comments, (3/16/12 Senate Commerce Comm. Hrng. at 1:06:50-1:07:06; 1:07:11-1:08:28, Ex. 2 to Anderson Aff. [Doc. No. 20-1]; Summary of Legislative History, Ex. 5 to Anderson Aff. [Doc. No. 20-1].)  These amendments received widespread bipartisan support.  The respective House and Senate bills containing the No-Fault amendments passed both houses unanimously.

(Summary of Legislative History, Ex. 5 to Anderson Aff. [Doc. No. 20-1].)

Having found the movants' challenge to a duly enacted state statute unlikely to prevail on the merits, the Court's analysis may end, as Rounds states, "If the party with the burden of proof makes a threshold showing that it is likely to prevail on the merits, the district court should then proceed to weigh the other Dataphase factors." 530 F.3d at 732 (emphasis added).   In Rounds, having concluded that the movant failed to produce sufficient evidence of its likelihood to prevail on the merits, the Eighth Circuit found that "we need not address the remaining Dataphase factors," and thus vacated a preliminary injunction entered on compelled speech grounds by the district court.  Id. at 738.   The Eighth Circuit, however, also noted that the likelihood of prevailing on the merits is "one, but not the only, threshold showing that must be met by a movant for a preliminary injunction."  Id. at 732, n.5.   While it is not necessary to address the remaining Dataphase factors, given that Plaintiffs have not established the likelihood of prevailing on the merits, the Court nevertheless does so, as the Court reaches the same conclusion when all of the Dataphase factors are considered.

### C.    Irreparable Harm

The other key factor in any analysis of preliminary injunctive relief is, of course, irreparable harm.  Chicago Stadium Corp. v. Scallen, 530 F.2d 204, 206 (8th Cir.1976).  Indeed, "'[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.'"  Rounds, 530 F.3d at 732 n. 5.  Thus, lack of irreparable harm will preclude preliminary injunctive relief

regardless of the other factors.  Dataphase, 640 F.2d at 114 n. 9 ("[T]he absence of a finding of irreparable injury is alone sufficient ground for vacating the preliminary injunction.").  Therefore, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm.  Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (per curiam); see, Winter, 555 U.S. at  22 (explaining that its "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction").

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  Elrod v. Burns, 427 U.S. 347, 373 (1976); see also Marcus v. Iowa Public Television, 97 F.3d 1137, 1140-41 (8th Cir. 1996)).  As Plaintiffs note, where "Plaintiffs have established 'a substantial likelihood of success on the merits of [their] First Amendment claim, [they] . . . also have established irreparable harm as the result of the deprivation." (Pls.' Mem. at 24 [Doc. No. 7]) (citing Am. Broad. Companies, Inc. v. Ritchie, No. 08-CV-5285 (MJD/AJB), 2008 WL 4635377, *7 (D. Minn. Oct. 15, 2008) (internal citations omitted)).  Here, however, the Court has reached the opposite conclusion, finding that Plaintiffs are unlikely to prevail on the merits of their First Amendment claim.  As discussed herein, the Court finds Plaintiffs unlikely to prevail because, on the record before the Court, Defendants' regulation of Plaintiffs' advertising is permissible under the First Amendment.  As there is no impingement upon Plaintiffs' First Amendment rights, there is no consequential irreparable harm flowing from a deprivation.

In Mr. Lewin's Declaration, he asserts that the amendments will negatively affect 411-Pain's ability to establish and build relationships with a network of health care providers.  (Lewin Decl. ¶ 22 [Doc. No. 12].)  He contends that 411-Pain cannot stay in business without such relationships.  (Id.)  In addition, he contends that the threat of disciplinary action from a professional licensing board will keep all health care providers from working with 411-Pain, causing economic harm to 411-Pain and chilling its speech as of January 1, 2013.  (Id. ¶ 23-24.)

Plaintiff Sergio Triana asserts that although he would like Truman Injury to continue its participation in 411-Pain's advertising network, he believes that he will be subject to disciplinary action if "Truman Injury accepts a referral of a patient for treatment of an injury eligible under Minnesota's No-Fault Act after January 1, 2013." (Triana Decl. ¶ 4 [Doc. No. 11].)  But for Minnesota's new law, Triana contends that he would advertise potential dollar amounts of recovery and run advertisements that feature actors portraying police officers or EMT personnel.  (Id. ¶¶ 6-7.)  Similar representations are made, although prospectively, by Dr. Mark Soll, a Minnesota licensed chiropractor who would like to participate in 411-Pain's network, but asserts that he will not join that network, in light of the No-Fault Act amendments, out of fear of disciplinary action. (Decl. of Mark Soll ¶¶ 2; 5 [Doc. No. 13].)

However, Minnesota licensed chiropractors such as Drs. Triana and Soll are already prohibited from disseminating deceptive, misleading, or incomplete advertising, including advertisements that do not contain the licensee's name.  Minn.

R. 2500.0200.  If Dr. Triana were to advertise in the manner that 411-Pain indicates

that it prefers to do business, he would appear to be in violation of Minn. R.

2500.0200.  As Defendants point out, "[t]he enactment of Subdivision 6(d), as applied

to 411 Pain's intention to build a network of chiropractors to advertise through it,

would only prevent a licensed chiropractor from doing what is already forbidden -

advertising without providing his or her name. . . ."  (Defs.' Opp'n Mem. at 20 [Doc.

No. 19].)

The Court finds that irreparable harm has not been established.  While the

nature of some of Plaintiffs' advertising may necessarily change, the change does not

constitute irreparable harm.   The Court thus finds that Plaintiffs have not

demonstrated irreparable harm necessary to enjoin the challenged provisions in

Minnesota's amended No-Fault Act.[7]

---

[7]  The Court notes that, elsewhere, in litigation brought by the Florida Attorney
General against 411-Pain pursuant to Florida's Deceptive and Unfair Trade Practices Act,
411-Pain agreed to various settlement terms, publicly available, some of which mirror the
restrictions found in the new amendments to Minn. Stat. § 65B.54, Subdivision 6(d).  The
Court takes judicial notice of the Florida settlement. While the Florida lawsuit focused on
411-Pain's advertisements related to attorney referrals, in the settlement of that case, 411-
Pain agreed not to use any advertising promising a specific amount of monetary reward,
nor to imply or misrepresent that a law enforcement official directed or mandated that
consumers contact 411-Pain after contacting 911 or other emergency services.  Stipulated
Consent Final Judgment at ¶ 22, Florida Office of the Attorney General v. 1-800-411-
Pain Referral Services, LLC., No. 12015527 (Fla. Broward County Ct. June 1, 2012),
http://myfloridalegal.com/ webfiles.nsf/WF/JLUS-8UUQ5L/$file/ 411PainJune2012.pdf,
accessed on 12/27/12.  In addition, the Florida settlement terms require 411-Pain to
"[m]odify any websites and all other online advertising used by [411-Pain] utilizing a
"Find a Lawyer" section or equivalent service to reflect only currently licensed lawyers. .
. ." Id. at ¶ 23(a).  Therefore 411-Pain has, in Florida, freely undertaken some of
measures at issue in this litigation – measures which it contends, here in Minnesota, will
continue...

### D.    Other Dataphase Factors

The remaining Dataphase factors require the Court to balance the harms between the parties and to consider the effect on the public interest. Dataphase, 640 F.2d at 113. The Court has noted the harms asserted by Plaintiffs in the above discussion of irreparable harm. Defendants, on the other hand, assert that deceptive and misleading advertising regarding the course of action that a car accident victim pursues following an accident is harmful to the citizens of Minnesota. (Defs.' Opp'n Mem. at 20 [Doc. No. 19].)

The Court finds that the balance of harms weighs in Defendants' favor. 411-Pain's advertisements provide no information to the public that a call to 411-Pain will result in a chiropractic or other health care referral. Moreover, callers have no idea to whom they will specifically be referred, as the identify of referral providers is unknown. In addition, 411-Pain touts the possibility of a car accident victim receiving "up to" $40,000 in economic loss benefits. As previously discussed, this specific dollar amount both artificially raises expectations for certain consumers, and, for other consumers, it implies a lower, more limited amount of recovery than that to which an injured car accident victim may be entitled.

As to the effect on the public interest, Robert Lewin of 411-Pain asserts that the amendments in the new No-Fault Act will harm members of the public. (Lewin Decl. ¶ 24 [Doc. No. 12].) He contends that 411-Pain's advertisements are

---

[7]...continue
result in irreparable harm.

"particularly valuable for accident victims who otherwise would not know who to call for assistance."  (Id. ¶ 24.)   The Court, however, finds that the public interest in receiving clear and non-misleading information regarding medical referrals weighs in favor of denying Plaintiffs' motion for a preliminary injunction.  Failing to provide information about the referral nature of 411-Pain's business and the identities of the providers in its network does a disservice to the public, as do advertisements that mention specific dollar amounts of potential economic loss recovery, and advertisements that imply law enforcement endorsement.

In conclusion, the Court finds that Plaintiffs are unlikely to prevail on the merits and have not shown irreparable harm in the absence of injunctive relief.  The remaining Dataphase factors by which this Court evaluates motions for preliminary injunctions also do not weigh in Plaintiffs' favor.  For these reasons, Plaintiffs' motion for such relief is denied.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

Plaintiffs' Motion for a Preliminary Injunction [Doc. No. 6] is **DENIED**.

Dated:   December 28, 2012                    s/Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge